## COMMERCIAL SHEARING & STAMPING CO. v. YOUNGSTOWN STEEL CAR CORPORATION.

### No. 7064.

Circuit Court of Appeals, Sixth Circuit.

Feb. 12, 1937.

C. P. Byrnes and Walter J. Blenko, both of Pittsburgh, Pa. (McKain, Ohl & Swanner, of Youngstown, Ohio, Byrnes, Stebbins & Blenko of Pittsburgh, Pa., and Guy Ohl of Youngstown, Ohio, on the brief), for appellant.

Charles F. Miller, Jr., of Washington, D. C. (Henderson, Wilson, Mason & Wyatt, of Youngstown, Ohio, Emery, Booth, Holcombe & Miller, of Washington, D. C., and William A. Mason, of Youngstown, Ohio, on the brief) for appellee.

Before HICKS and ALLEN, Circuit Judges, and LEDERLE, District Judge.

HICKS, Circuit Judge.

Suit by the Commercial Shearing & Stamping Company, appellant, against the Youngstown Steel Car Corporation, appellee, for infringement of claim 1 of letters patent No. 1,757,813, May 6, 1930, to Robert V. Proctor and Harry M. Schaab for a "tunnel liner"; and of claim 3 of letters patent No. 1,778,606, October 14, 1930, to Robert V. Proctor for a "metallic structure." Both patents were assigned to appellant.

The defenses were: Noninfringement, noninvention, anticipation, and estoppel. The court ruled that there was no infringement of either claim. Each patent related to tunnel lining.

For years it had been the practice in driving a tunnel, particularly through soft ground, to support the roof with timbers until a permanent lining of brick or concrete could be constructed. This practice was dangerous and called for working under the most cramped circumstances. Moreover, the timber was so heavy and thick, that much additional excavation was necessary to make room for it outside of the dimensions required for the permanent tunnel, necessitating the additional expense of filling in this large useless space around the tunnel barrel.

It is obvious that the wastes, dangers, and inconvenience of this type of tunnel-

ing could be reduced if an inexpensive metal support, possessing the strength of the timber and without its bulk, could be developed. A metal support was in use prior to Proctor and Schaab. As early as 1913 Chamberlain, a tunnel engineer, used a tunnel lining consisting of successive rings or courses of steel plates with flanges and arched to the curve of the tunnel. Except for the curve, due to the arching, these plates had the appearance of shallow metal boxes, the flanges being their sides. The side flanges of the plate were parallel, but those at the ends were not, being perpendicular to the arch of the plate proper. There was a slit at each corner between the ends of the flanges where the metal had been cut out to permit bending. These plates were bolted together, side to side, through holes in the side flanges, to the previously constructed arch ring and end to end to each other through holes in the end flanges, to form an arch around the upper part of the tunnel heading. Thus, as the excavation proceeded, the lining was extended plate by plate and arch ring by arch ring. If necessary, the liner plates were supported temporarily by trench jacks, mounted on a "needle beam," i. e., two sills bolted together and extending from the heading back into the completed tunnel, or, if the load was not too heavy, the jacks were supported by a single sill.

The plates used by Chamberlain were known as the "cut corner" or open corner plates. They were cold pressed out of steel plate. The Chamberlain lining was a decided improvement over the timbering process. It was less expensive both in the manufacture and application of its plates. It eliminated the added excavation necessary for placing the timbers and materially reduced the use of trench jacks. It afforded a greater degree of protection from "ravelling" or seepage from the top than did the timbering. The Chamberlain lining was well known to Proctor and Schaab. In their application filed February 26, 1927, they say: "It has heretofore been proposed to use steel plates bent to the radius of the outside of the tunnel wall. While these plates have had certain advantages over the old method of lining with wood, they have been disadvantageous in that they lacked stiffness across the corners. Moreover, trouble was frequently encountered at the corners of adjacent plates due to the presence of a small opening which allowed water and mud to seep through." Their problem was to remedy these disadvantages in Chamberlain by producing a cheaper liner plate, cold pressed, out of wrought metal which would more effectively resist the strains and stresses to which tunnel liner plates are subject and reduce the amount of jacking required in tunnel construction.

They produced a cold pressed wrought metal plate with integral flanges. It had no cut out corners. The flanges at the corners were unitary. The "three way corners" where the flange joined the plate were rounded and the flange corners at or near their edges were sharpened. When their plates were positioned in the tunnel by being bolted together, end to end and side to side, to the previously completed arch rings, through holes in their flanges, the lining thus completed would, we think, be an improvement over Chamberlain or the prior tunnel lining art. The contiguous flanges at the sharpened corners of the plates were mutually supporting and formed substantially tight joints. Thus, the lining as a whole would be strengthened to meet opposing incidental strains and stresses, and seepage would be reduced. But we need not determine whether Proctor and Schaab advanced beyond the prior art or simply refined it. If they did advance, it was but a short step. They were not pioneers. Their invention, if it existed, was not generic.

We have already considered the prior Chamberlain plate. In addition thereto sharp-edged flange corners are old in tunnel lining. See Japp patent, 806,673—1905. Sharp edged corners joined integrally by welding in a cast plate are disclosed by Vandervort patent, 852,916—1907, and by Humphryes, British patent, 127,735—1919. Humphryes also proposed cold pressing thin plates and hot pressing thick plates, both with sharp integral corners. These three patents and the Chamberlain structure, aside from numerous others in analogous arts, convince us that Proctor and Schaab produced their liner plate in a very narrow field. Claim 1 is as follows: "1. A wrought metal tunnel liner comprising a body portion having integral upstanding flanges, the flanges presenting a unitary unjointed structure at the corners of the body, the corners adjacent the edges of the flanges being relatively sharp, the flange metal at the corners being joined to the body portion by well-rounded corners."

It is a combination claim. It relates entirely to the material, form, and structure of the liner. Appellant should not, therefore, be permitted a monopoly upon other and different forms and structures. Directoplate Corp. v. Donaldson Lithographing Co., 51 F.(2d) 199, 202 (C.C.A. 6); D'Arcy Spring Co. v. Marshall Ventilated Mattress Co., 259 F. 236, 240 (C. C.A.6); McCallum v. Pittsburgh & Cleveland Coal Co., 268 F. 831, 835 (C.C.A.6).

It is necessary, therefore, to determine just what Proctor and Schaab claimed. One element, to wit, "* * * the corners adjacent the edges of the flanges being relatively sharp" is considered by appellant as of crucial importance. What is meant by relatively sharp corners must be determined in the light of the specifications and drawings. Figures 3 and 5 of the drawings indicate square corners at the edges of the flanges. In their application and three times in the specification Proctor and Schaab state as an advantage of the "relatively" or "substantially" sharp "corner" or "edge," that it prevented seeping. The specification contains this statement: "These unbroken metal corners present a substantially sharp edge and the two flanges are at right angles to one another. Therefore when the plates are joined up there is no small corner opening which permits seepage." From these statements nothing is clearer than that the sharpness that Proctor and Schaab were claiming was an angularity making for substantially tight and mutually supporting joints.

Appellee's alleged infringing liner plate was designed for a tunnel of the Metropolitan Water District of Southern California. The engineering problems presented do not appear. Whether the excavation was through rock or soft earth or whether "ravelling" or seepage was encountered is not disclosed. Appellee's liner plate has a body portion with integral upstanding flanges presenting a unitary unjointed structure at the corners and rounded corners where the flange joints tie in with the body portion (whether as "well rounded" as Proctor and Schaab is not clear). But there was one conspicuous difference between the two plates. Whereas Proctor and Schaab had four flanges, two side and two end, with four corners where they joined, appellee's body portion had diagonal corners, whereat four additional short flanges, each two and one-half inches long, joined integrally the ends of the two sides and the two end flanges. Thus, when appellee's plates were bolted into position, the offsets at the corners produced by the diagonal flange sections left large openings. It seems to us apparent, therefore, that the element, to wit, "the corners adjacent the edges of the flanges being relatively sharp" is omitted from defendant's structure and we concur with the holding that infringement was not shown. We think it is fair to assume that appellee left large openings in its structure because the conditions in the California tunnel did not require closed joints.

Patent No. 1,778,606: In metallic tunnel liners of cylindrical shape, made up of sections laid side by side and end to end, such as the tunnel liner plates of patent No. 1,757,813, circumferential stresses develop. In order to meet these stresses and to endow the structure with strength beyond that provided by bolting flanged, arcuate plates to each other, Proctor provided "bracing bands secured between certain of the courses."

The specifications describe a preferred form of bracing band as "a shaped beam of conventional shape, here illustrated as a T-iron, the flange of which is inserted between the flanges of different courses with the securing bolts extending through the flanges of the different courses and the flange of the reinforcing band. * * * With this construction a single row of bolts serve to secure each joint." Thus the bands of T-iron are disposed circumferentially of the structure overlapping adjacent courses of the plates and having a flange between the courses through holes in which bolts are inserted. Further quoting from the specifications—"While a number of metallic shapes of a standard form can be used for the reinforcing band, I have illustrated a commercial T-iron having the stem of the T inserted between the courses and the head of the T engaging the corners of the adjacent wall units. * * * By having the flanges * * * on the plates * * * extend inwardly of the structure and by" placing "the bands * * * between adjacent courses in close engagement with the outer surface of the plates * * * a very rigid, neat and compact structure is obtained."

Claim 3 as follows is in suit: "A metallic structure comprising a plurality of courses each made up of a series of plates having flanges thereon, and means for se-

curing adjacent courses comprising a circumferentially arranged band disposed in part between adjacent flanges and in part externally of the plates for engaging the outer edges thereof."

Appellee's supporting rib was an I-beam, the upright portion of which was placed between the courses of the plates engaging the flanges thereof. Each cross-part of the I-beam lay either completely within or completely without the metallic structure and did not engage the plates proper at any point. Appellee claims, therefore, its structure did not infringe since no part of it lay "externally of the plates for engaging the outer edges thereof."

Appellant replies that this clause referred to the opposite sides of the upright part of the T-iron and did not refer to the outside surface of the plate.

Our examination of the language of the claim convinces us that appellant's interpretation is untenable. Earlier in the claim it is said the circumferentially arranged band is "disposed in part between adjacent flanges." To accept appellant's hypothesis as to the clause, "for engaging the outer edges thereof," the claim would in effect be saying that the part, already disposed between adjacent flanges, also engaged those flanges with its outer faces (or "outer edges"). This is substituting redundancy for the obvious meaning that the T-iron also engages the outer edges of the plates.

Appellee's structure does not infringe.

The decree is affirmed.